UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-20777-CR-MARTINEZ/GARBER

UNITED STATES OF AMERICA,

v.

CHARLES OSASUMWEN OBASUYI,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court by Order of Reference from United States District Judge Jose E. Martinez. Pursuant to such reference the Court has received the defendant Obasuyi's Motion to Suppress Physical Evidence and Statements and Incorporated Memorandum of Law (DE 21) and the government's response in opposition (DE 26). A hearing on said motion was held on January 7, 2014. The defendant appeared with his attorney, Robert G. Amsel, and the government was represented by Assistant United States Attorney Maurice A. Johnson. Two members of the Aventura Police Department, Detectives Sean Bergert and Kenneth Sealy, as well as the defendant, testified at the hearing.

## FACTUAL BACKGROUND[1]

On May 29, 2013, members of the Aventura Police Department's Crime Suppression Unit were conducting proactive vehicle burglary surveillance at the Aventura Mall, located in Aventura, Florida. While conducting the surveillance, one of the members of the unit, Detective Bergert watched a white SUV, with what he suspected were illegally tinted windows, enter a bank parking

---

[1] Where testimony regarding the facts of this case is in conflict, the Court will so note, describing the conflict and the Court's resolution, if any, thereof.

lot. Upon recognizing the darkly-tinted car as a rental, based on bar code stickers on the windows, Bergert radioed his team of the presence of the vehicle. Detective Sealy, another unit member, after hearing Bergert's radio call, positioned himself so that he too could view the parking lot and the car. The car, after traveling in several different directions through the lot, stopped at the end of one of the parking aisles, not in a parking spot but in a travel lane, behind some shrubbery. After the car stopped, a man exited in the front passenger door, glanced around as if to see if he was being watched, and then quickly made his way across the lot towards an ATM, which was located right next to an open parking spot.

Sealy observed the passenger interact with the ATM. Though he could not make out the particular details of the transaction, he described the interaction as being consistent with conducting a withdrawal transaction from the ATM. After the transaction, the passenger looked around again and then jogged back to the car. The driver, later identified as the defendant Charles Obasuyi, then headed for the parking lot exit.

As the car left the parking lot, Bergert hung back and let Sealy follow the car so as not to arouse any immediate suspicion by having his car follow Obasuyi directly out of the parking lot. As Sealy pulled in behind Obasuyi, he ran the license plate and was able to confirm that the car was indeed a rental as suspected. Bergert then followed at a distance. Eventually, as Obasuyi made his way away from the mall and towards a causeway, the detectives realized he would soon be leaving their jurisdiction. At that point, the decision was made to conduct a traffic stop, using the suspected tint violation as a basis for the stop so that they could make contact with the occupants of the vehicle.

The detectives and Obasuyi disagree about some of the particulars of how the traffic stop was actually effected. All parties agree, however, that there were at least three police vehicles, blue lights

flashing, that surrounded Obasuyi's car just as he was about to proceed through an intersection, some distance from the mall. One unmarked police vehicle pulled in front of him; one was behind him (driven by Bergert); and another on the passenger side. Though Obasuyi claims that Sealy did not arrive until minutes after the initial stop, both Sealy and Bergert testified that Sealy was driving the lead car that ultimately stopped in front of Obasuyi.[2] There is no dispute that Bergert then approached Obasuyi's car on the driver's side. Obasuyi, however, claims that Bergert had his gun drawn and pointed directly at him while Bergert testified that, although his gun was out, it was pointed at the ground. Both Bergert and Sealy testified that Sealy approached on the passenger's side while Obasuyi maintains that another officer approached and that, again, Sealy didn't arrive until minutes after the stop. Sealy says that he approached the passenger's side with his weapon holstered but unlatched and visible, with his hand on it. Obasuyi insists it was another, unidentified officer, who approached on that side and that that officer, like Bergert, also had his gun out and pointed towards the car.

The detectives' account of what happened next also conflicts with Obasuyi's version of events. According to both detectives, as they approached Obasuyi's car, Bergert shouted for the occupants to roll down their windows. When neither the driver nor the passenger complied, Bergert knocked on the driver's side window and motioned for the window to be rolled down at which point Obasuyi finally complied. As the window came down, Begert saw an open, white envelope on Obasuyi's lap in which he could discern small bundles of cash and what looked like multiple credit or debit cards. Begert then asked the driver for his license and the rental agreement for the car. Obasuyi responded that he didn't have either one and then appeared to become quite nervous and

---

[2] Defense counsel presented a Computer Aided Dispatch report, as defendant's Exhibit 2, which he felt indicated that Sealy arrived some six minutes *after* the initial stop. Sealy, however, explained that the CAD report really only reflected the time that his information was inputted into the system; not when he actually arrived on the scene.

3

fidgety, reaching his hands into areas that had not yet been cleared. At this point, as a safety precaution, Begert says he ordered Obasuyi out of the car and had him stand at the rear of the vehicle. As Obasuyi got out of the car, he pushed the envelope on his lap off to the side and then Begert saw another similar white envelope in the driver's side door pocket. That envelope also appeared to contain cash and multiple credit or debit cards. While Begert dealt with Obasuyi, Sealy was similarly engaged with the passenger. As Sealy reached and opened the passenger-side door, the window started to roll down. After opening the door, Sealy too observed the open white envelope, containing cash and cards, on Obasuyi's lap.

    Obasuyi's version differs. He claims that as Begert and an unidentified officer, not Sealy, approached his car, with guns drawn and pointing in his direction, he immediately rolled down his window. He says that as he rolled down the window, Begert opened the car door and Obasuyi stepped out with his hands up, at which point Begert cuffed him and led him to another car. He denies that there was a white envelope in his lap and denies that Begert asked him for his license and rental agreement while he was still in the car.

    According to the detectives, after Sealy had dealt with the passenger, ultimately resulting in the passenger's being placed in handcuffs into the back of a marked police car, Sealy directed his attention to Obasuyi. Sealy testified that, while Obasuyi stood at the back of the car, he asked him for his name, date of birth, and whether he had a license. Sealy says that the defendant provided his date of birth and said that his first name was "Charles" and that his last name was "Obasur."[3] Upon a routine identification check based on that name and date of birth, no record was returned. At that

---

[3]On cross-examination, Sealy explained that his grand jury testimony, wherein he claimed that the defendant provided the name "Obasay," as opposed to "Obasur," was simply in error.

point, Sealy advised Obasuyi of his *Miranda* rights which Obasuyi waived, agreeing to speak. Sealy again asked the defendant to identify himself but he continued to maintain that his last name was Obasur. Again Sealy tried to verify the information but no record was returned. The driver then denied having just been in the bank parking lot and denied that his passenger had used the ATM. He also denied any knowledge about the envelopes that the detectives had seen in the car. Based on the preceding events, Obasuyi was then taken into custody for obstruction as well as driving on an invalid driver's license. He too, along with the passenger, was placed in the back of the marked police vehicle which was equipped with a digital recorder that, unbeknownst to them at the time, preserved Obasuyi and the passenger's conversation. Both were ultimately transported to the Aventura Police Department.

Obasuyi, on the other hand, maintains that none of the questioning by Sealy happened on scene and that the only time Sealy questioned him was back at the police department. He says that, upon being stopped, he was immediately cuffed, his car was searched, and then he was placed into the marked car with the passenger. He said that another officer on scene asked him his name and that he replied accurately and truthfully.

Ultimately, the Court finds the testimony of detectives Bergert and Sealy to be highly credible. Their testimony was consistent and stood up under cross-examination by defense counsel. Both detectives are highly trained and experienced, each with at least ten years of police experience. Sealy, in particular, is a part-time Task Force Officer with the Internal Revenue Service Identity Theft Task Force and Identity Theft Strike Force Team. Their testimony was unbiased in that neither officer has an interest in the outcome of these proceedings other than to present and testify to the truth. They appeared to the Court to be forthright and thoughtful and dealt objectively with the issues raised by

the defense. The defendant, on the other hand, has an obvious interest in the outcome of these proceedings. Furthermore, he admitted that while Bergert approached his side of the car, he was, understandably, paying attention to Bergert's gun. He therefore might not have been in the best position to observe Sealy's presence or actions. Under the circumstances, the Court finds it likely that the defendant was highly distracted by the events unfolding around him which would tend to render his recollections somewhat less reliable.

## PROCEDURAL BACKGROUND

Based, at least in part, on the contents of the envelopes discovered in the defendant's car, a Southern District of Florida grand jury returned an indictment charging the defendant with: one count of conspiracy to possess fifteen or more unauthorized access devices, in violation of Title 18, United States Code, section 1029(b)(2); one count of possession of fifteen or more unauthorized access devices, in violation of Title 18, United States Code, section 1029(a)(3) and 2; and four counts of aggravated identity theft, in violation of Title 18, United States Code, sections 1028A(a)(1) and 2. (DE 3.) Obasuyi has since been arraigned on the indictment and has pled not guilty. Presently before the Court is the defendant's motion to suppress statements and physical evidence.

## DISCUSSION

The issues before the Court, as raised by the defendant, are (1) whether there was probable cause for his arrest; and (2) whether the ensuing search of his car was justified. The Court answers both questions affirmatively.

I. **The Seizure Was Proper**

Obasuyi argues that, because the police who stopped his car for its suspected illegal window tenting were really only fishing for evidence of some other fraudulent activity, both the stop and the

arrest were unreasonable under the Fourth Amendment. He takes particular issue with the overwhelming show of force exhibited by the detectives and officers when his car was initially stopped, supposedly only for a window-tinting violation. He also complains that there was no probable cause for the arrest, which followed.

    A.    **The Stop**

With respect to the stop, Obasuyi's argument is that, based on the show of force exhibited, the initial contact by the police was actually an arrest. In other words, he argues, the seizure at issue here was conducted in such an extraordinary manner, that it falls outside of the usual rule, as enunciated by the United States Supreme Court in *Whren v. United States*, that probable cause to believe the law has been broken outweighs one's private interest in avoiding police contact. 517 U.S. 806, 818 (1996). The Court does not find the facts before it so extraordinary as to warrant a finding that the seizure here was so "unusually harmful to an individual's privacy or even physical interests" that a balancing test would be warranted. *Id*. at 818.

Obasuyi urges that the following factors push this case beyond the limits of *Whren*: the number of vehicles that surrounded him for the stop; that the cars that made the initial stop were unmarked; that the detectives had their weapons pointed at him as they approached; and that he was immediately ordered out of the car and cuffed. As an initial matter, the Court has found that, although Detective Bergert had his gun unholstered, neither detective who approached Obasuyi's car had his weapon pointed at him. Further, based on the testimony presented, the Court finds that Obasuyi was not immediately cuffed upon Bergert reaching the car. Rather, as Bergert approached, he shouted for the occupants to roll down the windows. Receiving no response, Bergert knocked on the window and motioned for the window to be rolled down at which point Obasupyi finally complied. As the window

came down, Bergert saw an envelope, containing cash and plastic cards, in Obasuyi's lap. Then, upon being asked to produce his license and rental car agreement, which he didn't have, Obasuyi became nervous and fidgety, reaching into areas that had not yet been cleared. It was only at this point that Bergert asked Obasuyi to step out of the car. And then it wasn't until after Sealy was unable to verify the defendant's identity, because of Obasuyi's inaccurate answers, that the he was handcuffed and placed into a police car.

      The detectives based their stop of Obasuyi's car on their determination that the car appeared to have illegally tinted windows. A road-side test of the windows then corroborated the detectives' suspicions that the tinting was indeed too dark under Florida law. As set forth in *Whren*, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810. Though Obasuyi pointedly does not concede this point, nothing in the record controverts that the detectives had probable cause to believe that, because of the dark tinting, a traffic violation had occurred. The police surrounded Obasuyi's car with unmarked vehicles, intentionally containing it to prevent flight, as a matter of safety. Once the car was stopped and the detectives approached Obasuyi's car on foot, the tint prevented them from seeing inside of the vehicle. In the interest of their own protection from the unknown, one detective unholstered his gun while the other unlatched his. Upon receiving no initial response to his order to roll down the window, Bergert knocked on the defendant's window. Nothing in this exchange, especially in light of the detectives' inability to see into the car and the occupants' initial unresponsiveness, rises to the level of extraordinariness as contemplated by *Whren*. The examples listed by the Supreme Court in *Whren* involved such extraordinary scenarios as: seizure by means of deadly force, unannounced entry

into a home, entry into a home without a warrant, or physical penetration into the body. *Id*. at 818. The facts in this case do not even come close.

In addition to having probable cause for the stop based on the traffic violation, the detectives also had reasonable suspicion, under *Terry v. Ohio*, once the stop had been effected, to conduct further inquiry regarding their observations of the defendant and his passenger at the bank. 392 U.S. 1 (1968). Both Sealy and Begert found the behavior of the driver and occupant to be suspicious. In Begert's experience, many defendants arrested for car burglaries are driving rental vehicles, most of which have been illegally tinted, as he suspected of Obasuyi's car. Additionally, both detectives found Obasuyi's driving pattern strange considering the availability of the drive-through lane ATM's as well as the availability of parking directly adjacent to the walk-up ATM that Obasuyi's passenger used. Begert, in particular, surmised that intent of the car's occupants was to stay out of view of any of the bank's cameras. Sealy noted that on numerous occasions the passenger, upon exiting the car, during his interaction with the ATM, and upon returning to the car, repeatedly looked around, as if to make sure nobody was watching him. Further, Begert noted that, in his experience, car burglars will often break into cars, steal the identities of the occupants of the cars, and then head straight to bank ATMs in an attempt to withdraw funds from their victims' accounts. Taken together, the circumstances supported the detectives' suspicion that the defendant was connected with some sort of criminal activity. This reasonable suspicion supported the detectives' cursory investigation which included inquiring as to Obasuyi and the passenger's activities and identification as well as a cursory search of the vehicle.

B. **The Arrest**

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *United States v. Lopez-Garcia*, 565 F.3d 1306, 1314 (11th Cir. 2009). Probable cause "deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949). Notably, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 245 n. 13 (1983). Even "seemingly innocent activity" can be the basis for probable cause. *Id*. In the end, probable cause requires only "reasonably trustworthy information." *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) (internal quotation omitted).

Here, the detectives had probable cause to stop Obasuyi for driving a car with windows which were suspected to have been illegally tinted. Following the initial stop, upon inquiry, Obasuyi was unable to produce either his driver's license or the rental agreement or registration for the car he was driving. As Obasuyi stepped out of the car, the detectives both observed open, white envelopes containing currency and plastic cards, in plain sight, both on the driver's lap as well as in the driver's side door pocket. Sealy *Mirandized* Obasuyi and asked him a series of questions regarding his identity and whether or not he had a driver's license or some other form of identification. Based on the information that Obasuyi provided to Sealy, Sealy was unable to confirm that Obasuyi had a valid Florida driver's license, or even his identity, or whether he was legally entitled to be driving the car. Based on this lack of cooperation, or what certainly appeared to be a lack of cooperation, the detectives had probable cause to believe that Obasuyi was obstructing justice by providing false

10

information concerning his identity and therefore lawfully arrested him.[4]

## II. **The Searches Were Proper**

### A. **The Search on Scene**

Pursuant to the automobile exception, law enforcement may conduct a warrantless search of an automobile where: (1) the automobile is readily mobile; and (2) there is probable cause to believe that the automobile contains contraband or evidence of a crime. *See United States v. Lanzon*, 639 F.3d 1293, 1299-1300 (11th Cir. 2011). "Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in the vehicle under the totality of the circumstances." *Id*. at 1300. When probable cause exists to search a vehicle, law enforcement may search for evidence in any area of the vehicle where it is believed evidence may be that is relevant to the offense of arrest or even relevant to offenses other that of the arrest. *Arizona v. Gant*, 556 U.S. 332, 347 (2009)(summarizing the holding in *United States v. Ross*, 456 U.S. 798 (1982)).

Here, Obasuyi was stopped for driving a car with illegally tinted windows. Upon making the stop, law enforcement observed two envelopes in the vehicle that contained cash and plastic cards. When asked about the cards, the defendant claimed not to have any knowledge. Both Sealy and Begert found the behavior of the driver and occupant to be suspicious.

Once Obasuyi was under arrest for providing false information, law enforcement has probable cause to search the entire vehicle for any evidence that would: (1) help confirm the true identity of

---

[4]At the suppression hearing, defense counsel argued that under a Florida case, *W.W. v. Florida*, 993 So. 2d 1182, Obasuyi could not be arrested for obstruction for simply not providing the proper spelling of his last name. The Court finds that case inapposite. There, the police were merely seeking information from the defendant in an investigatory capacity. Here, the detectives were actually in the process of "executing a legal duty" by stopping Obasuyi for a suspected traffic violation. As has been presented by the Court, above, the detectives had legally detained Obasuyi and as they began processing the stop, by asking for the driver's identification and information about the car, the defendant attempted to thwart the detectives' efforts–thereby unlawfully obstructing the detective in the performance of his legal duty.

11

the defendant; and (2) any other evidence regarding criminal activity, which the detectives suspected based on the observed actions and behavior of the driver and passenger. Thus the cursory search at the scene was lawful.

      B.    **The Inventory Search**

Under the inventory search exception to the warrant requirement, when police have taken lawful custody of a car, the police may search that car and inventory its contents. *Colorado v. Bertine*, 479 U.S. 367 (1987); *South Dakota v. Opperman*, 428 U.S. 364 (1977). To establish the exception, the government must show: (1) "that the officers had the authority to impound the defendant's vehicle"; and (2) "that the officers complied with departmental policy in conducting the search." *United States v. Williams*, 936 F.2d 1243, 1248 (11th Cir. 1991).

Since the arrest of the defendant was lawful, the police has authority to impound his car. In addition, introduced into evidence was the Aventura Police Department's General Orders concerning Towing, Storage, and Release of Vehicles Policy that states that any vehicle impounded by the Aventura Police Department must be inventoried and recorded on a property sheet. In the event that articles are removed, the items should be listed as being found in the vehicle and the location where they were found.

The rental car was transported back to the Aventura Police Department so that law enforcement could take photographs of the vehicle. Once the photographs were taken, the envelopes that contained the cash and cards were removed from the vehicle and itemized on a property sheet. The property receipt listed where the property was recovered, how much cash was inside the vehicle, and the different names embossed on the fifteen different credit and debit cards. The search was no doubt a lawful inventory search.

## CONCLUSION AND RECOMMENDATION

For reasons set forth above and based upon the Court's review of the records, and consideration of the testimony, submissions of the parties and argument of counsel, the undersigned respectfully

RECOMMENDS that the defendant Charles Obasuyi's Motion to Suppress Physical Evidence and Statements (DE 21) be DENIED.

The parties have fourteen (14) days from the date of this Report and Recommendation within which to file written objections, if any, with United States District Judge Jose E. Martinez. *See* 28 U.S.C. §636 (1991). Failure to file timely objections may bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this 24th day of January 2014.

_____
BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE